UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:08-CR-093 KJM |
| Plaintiff, | |
| v. | ORDER |
| ANDREW VU, | |
| Defendant. | |

   In this criminal case, defendant Andrew Vu pled guilty to conspiring to commit mail fraud through his participation in a scheme to defraud homeowners in distress and strip them of the equity in their homes. Mr. Vu was sentenced on December 19, 2014, with a determination of restitution deferred. After multiple continuances, the parties did not reach an agreement regarding restitution and the court set a briefing schedule to determine the matter. In its brief, the government seeks restitution in the total amount of $6,986,482.45, on behalf of 67 homeowner victims. ECF 1338. Mr. Vu has responded generally, pointing to the law imposing the burden of establishing restitution on the government, and noting that the government must prove that each victim suffered a loss and the loss is attributable to Mr. Vu. ECF 1335. Having carefully reviewed the parties' filings and the government's exhibits, as explained below, the court ORDERS Mr. Vu to pay restitution in the total amount of $6,242,641.51 to a total of 59

/////

victims. To the extent the court does not award restitution, its decision is without prejudice to the government's resubmission of supplemental supporting documentation for the requests denied.

BACKGROUND

Mr. Vu was charged along with fifteen codefendants in February 2008 with conspiracy to commit mail fraud, mail fraud and conspiracy to commit money laundering. ECF 1. He pled guilty on June 15, 2009 to conspiring to commit mail fraud. ECFs 266, 268. In the factual basis supporting his plea, which he admitted during the sworn plea colloquy stated what happened and what he did, Mr. Vu agreed that he became a member of the mail fraud conspiracy led by Charles Head "no later than January 1, 2004," that he "worked as an employee of Head Financial Services (HFS) beginning in October 2003 and continued working for HFS and later, possibly a related company of Charles Head's, Creative Loans, until at least November 2005." ECF 268 at 15:14-20. Mr. Vu also agreed that after November 2005, "and at least until March 2006, [he] continued to collect 'rents' on properties he acquired during his work for defendant Charles Head." *Id.* at 15:20-22. He admitted that he participated in the scheme to defraud with fifteen coconspirators, including Charles Head and Jeremy Michael Head. *Id.* at 15:9-13.[1]

The factual basis supporting Mr. Vu's plea does not identify homeowner victims of Mr. Vu's criminal activity by name. *Id.* at 15-19. It says Mr. Vu served as a loan application broker, recruited straw buyers,[2] directly solicited homeowner victims as a sales agent, and signed off on "multiple" loan applications for six other named codefendants. *Id.* at 16:6-18, 27-18. The factual basis provides "an example" of Mr. Vu's approach to dealing with homeowners, describing activities targeting homeowners in San Pedro, California in "early 2005." *Id*. at 18:18-19:10. The factual basis concludes by stating that "[o]f the equity defendant Vu received from the sale of the five homes on which he acted as sales agent, he gave 50% of it to co-conspirator

---

[1] The other thirteen coconspirators are: Justin Wiley, Joshua Coffman, Elham Assadi, Leonard Bernot, Akemi Bottari, John Corcoran, Sarah Mattson, Domonic McCarns, Anh Nguyen, Omar Sandoval, Xochitl Sandoval, Eduardo Vanegas, and Kou Yang. ECF 268 at 15.

[2] The straw buyers here were persons in whose name a home was placed, without ownership of the home actually transferring to them. *See, e.g.*, ECF 723 at 5 (jury instruction from trial of codefendants).

Charles Head. Defendant Vu later resold one of the properties to [another] co-conspirator [] and divided the additional equity from the home, . . . with $15,000 [going] to himself." *Id.* at 19:11-16.

At Mr. Vu's sentencing, the court in calculating his Sentencing Guidelines range found a total loss of between $2.5 and $7 million, and applied an 18 level enhancement as contemplated by the parties' plea agreement under USSG § 2B1.1(b)(1)(J). *Id.* at 10. The court applied a 4 level enhancement under USSG § 2B1.1(b)(2)(B) in light of Mr. Vu's offense having involved between 50 and 250 victims, also as the parties had contemplated. *Id.* In his sentencing memorandum, which included objections to the Presentence Investigation Report (PSR) sustained by the court, Mr. Vu's counsel noted that Mr. Vu's offense conduct "took place between 2004-2006." ECF 1101 at 3:14. In varying downward to sentencing Mr. Vu to a term of six months, the court relied on the description of the conspiracy comprising Mr. Vu's offense conduct contained in the PSR, to which Mr. Vu did not object. *See* ECF 1080 (sealed PSR, ¶¶ 5-18). In particular, the PSR noted that Mr. Vu "participated in multiple aspects of the conspiracy," and described those aspects consistently with the information in the factual basis supporting Mr. Vu's plea. The PSR also noted that the number of victims and the losses those victims suffered were the results of "foreseeable acts of coconspirators during the time period that Vu was a participant in the scheme." *Id.*

With its restitution memorandum, the government has provided selected pages of documents demonstrating the nature of the conspiracy: Charles Head's company bulk-purchased postcards for mass mailing to distressed homeowners, the company directed co-conspirators to work lists of homeowner "leads," and it provided a script for use in persuading homeowners to sign the documents transferring title to their homes, while they were being told they would remain on title. ECF 1353-1, Exs. B, C, D; *cf.* ECF 268 at 17-19 (describing Mr. Vu's actions as including making "materially false promises" regarding homeowners' remaining on title, among other things). Some of the government's documents, or the same types of documents, were admitted at trial of Mr. Vu's admitted co-conspirators Charles Head and Jeremy Michael Head.

/////

*See generally* ECF 766 (Exhibit List, Trial of Charles and Jeremy Michael Head).  Mr. Vu has not objected to the court's reliance on any of the government's exhibits, and the court considers them.

I.     APPLICABLE LAW

The Mandatory Victim Restitution Act (MVRA) requires the court to order "in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense. . . ," 18 U.S.C. § 3663A(a)(1), when the offense is one "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B).  "Victim" is defined to mean "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

In ordering restitution under § 3663A, "in a case involving a conspiracy or scheme, restitution may be ordered for all persons harmed by the entire scheme." *United States v. Riley*, 335 F.3d 919, 931 (9th Cir. 2003) (citation omitted).  Specifically, "[r]estitution is not confined to the harm caused by the particular offenses to which [defendant] pleaded guilty. . . . A conspirator is vicariously liable for reasonably foreseeable substantive crimes committed by a coconspirator in furtherance of the conspiracy." *Id.* (citations omitted).[3]

In determining whether an individual victim's claimed harm should be compensated through a restitution award, the court looks to whether "the harm to the victim [is] closely related to the scheme, rather than tangentially linked," *Riley*, 143 F.3d at 1292, or is reasonably foreseeable, *United States v. Lotze*, 192 F. App'x 598, 600-01 (9th Cir. 2006).

---

[3] While defendant's attorney cites to several cases in his brief regarding restitution, the government is correct that those cases do not address the court's obligations in determining restitution, but rather focus on sentencing enhancements under the Sentencing Guidelines, in particular with respect to determining the number of victims for purposes of calculating any enhancement under USSG § 2B1.1. *See United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005); *United States v. Brown*, 771 F.3d 1149 (9th Cir. 2014); *United States v. Armstead*, 552 F.3d 769 (9th Cir. 2008); *United States v. Showalter*, 569 F.3d 1150 (9th Cir. 2009).

In resolving any dispute regarding the amount of restitution, the court applies the preponderance of the evidence standard. 18 U.S.C. § 3664(e); *see Ward v. Chavez*, 678 F.3d 1042, 1050 (9th Cir. 2012) ("section 3572 [providing for imposition of fine and restitution] is modified here by section 3664, which applies specifically to a mandatory restitution order imposed under the MVRA . . ."). The burden of demonstrating the amount of loss "sustained by a victim as a result of the offense" rests on the government. 18 U.S.C. § 3664(e). While defendant has the burden of demonstrating his financial resources, and the needs of any dependents, *id.*, Mr. Vu here does not argue that he lacks the resources to pay restitution.[4]

II.     ANALYSIS

The government's requests for restitution are all based essentially on a "reasonable foreseeability" theory, with all of the victims' initial losses occurring during the time frame Mr. Vu worked with Mr. Head, between January 2004 and March 2006, and all losses resulting from the activities of Mr. Vu or his admitted coconspirators. In one instance, Mr. Vu played a direct role by recruiting the straw buyer in whose name the financial transaction was effected; the victim of this transaction was T.R. ECF 1338 at 20-21. The restitution requests advanced by the government fall into three categories: 1) losses based on the equity stripped from a home when an unwitting homeowner entered into a first transaction with coconspirators removing the homeowner from the title, 2) losses based on the further stripped equity when coconspirators sold the home to a third party with a net gain to the coconspirators, and 3) other losses requested by homeowners in victim impact statements and related communications with the government's attorneys.[5] The court discusses each category below.

---

[4] Mr. Vu's PSR shows he had at the time of sentencing a net positive monthly cash flow of approximately $1,200, but a negative net worth of approximately $12,000. PSR at 13. It appears Mr. Vu will be able to make modest installment payments toward his restitution obligation, jointly and severally with codefendants. In any event, the record before the court on the government's request does not require the court to determine whether blood can be squeezed from a turnip.

[5] The victim impact statements referenced only generally by the government, *see, e.g.*, ECF 1338 at 4:25, include quite a few requests that are not identified in the government's restitution memorandum. On the assumption the government has narrowed its restitution request to cover those items it believes are recoverable under the law, the court does not address every request in

A. Equity Stripped During First Transaction With Coconspirators

The court has carefully reviewed the document excerpts supporting this category of request, attached as exhibits to the government's restitution memorandum. In each instance, the court has confirmed that the first transaction with coconspirators occurred during the 2004 to 2006 time frame during which Mr. Vu has admitted being a part of the mail fraud conspiracy led by Charles Head. The court also has confirmed that at least one person Mr. Vu admits to knowing as a coconspirator or a company controlled by coconspirators was involved in the transaction. *See* ECF 1338, Exs. A through MM, SS, UU. In the T.R. transaction, as noted, Mr. Vu himself was involved as a straw buyer recruiter.[6] *See id.,* Ex. EE (naming V.T., identified in factual basis to plea agreement as Mr. Vu's girlfriend, as buyer).

The court finds by a preponderance of the evidence that Mr. Vu is vicariously liable for the reasonably foreseeable losses in this first category, related to 41 homes and as claimed by 55 victims, including 14 couples. These losses are identified in Column A in the table attached to and incorporated into this order as **Exhibit A**.

B. Equity Stripped When Coconspirators Resold Homes

The court also has carefully reviewed the documents supporting this category of request, also attached as exhibits to the government's restitution memorandum. The court has confirmed that coconspirators resold to third parties 13 homes owned by 17 victims, including 4 couples, during the 2004 to 2006 time frame of Mr. Vu's participation in the conspiracy. *See* ECF 1338, Exs. A, B, D through J, Q, T, FF, GG (victims R.B./L.B., F.H./D.H., K.J., E.F., M.S., R.F., R.L./G.L., L.M., T.W., J.B., Y.S., R.E./E.E., L.V.).

The resale of 10 homes of 16 other victims, including 6 couples, occurred after the March 2006 date identified generally as the end of the time during which Mr. Vu himself was directly involved in the conspiracy. *Id.*, Exs. C, K, M, N, O, R, V, DD, II, KK (victims S.T./B.T., P.S., T.C./T.C., M.R./D.R., J.W./D.W., M.C., R.M./K.M., E.S., E.W./L.W., H.M.). Most of this

---

the victim impact statements.

[6] T.R. appears in the first row of the table in Exhibit A, as a reflection of her unique status of having a more direct connection to Mr. Vu than other victims.

second group of resales occurred later in the same year Mr. Vu left, between June and December 2006. *Id.*, Exs. C, K, M, N, O, V, DD, II. Two occurred in 2008, one in April of that year and one in October. *Id.*, Exs. R (M.C.), KK (H.M.). In every instance of resale of a home, whenever resale occurred, either a person Mr. Vu knew was a coconspirator or a straw buyer used by a coconspirator was involved in the transaction, or the escrow company used by the Charles Head operation handled the transaction. *See generally id*. (key documents identifying straw buyers Marissa Page, Laurie Coffman, Adam Coffman, Brendan Parker, Shawn Willis, Eduardo Vanegas, Jason Marshall, Juan Urena, Abraham Urena, Ryan Wiley, Maria Sandoval); *see also* ECF No. 769 at 27-29 (trial testimony of Omar Sandoval confirming Abraham Urena, Juan Urena, and Eduardo Vanegas as straw buyers); ECF No. 809 at 111-112[7] (Adam Coffman); ECF No. 808 at 58-61 (Jason Marshall); ECF No. 807 at 93-130 (Castlehead Escrow dealings with Charles Head operation between 2001 and 2005).

   The court finds by a preponderance of the evidence that Mr. Vu is vicariously liable for the reasonably foreseeable losses in this second category as well, including for the equity amounts lost upon resale of the victim's former homes after March 2006. *Riley,* 335 F.3d at 932 (conspirator "vicariously liable for reasonably foreseeable substantive crimes committed by a coconspirator in furtherance of the conspiracy."). The Ninth Circuit has approved restitution for losses "at least one step removed from the offense conduct itself," clarifying that a "defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct." *United States v. Gamma Tech Indus., Inc.,* 265 F.3d 917, 928 (9th Cir. 2001). Ultimately, "[t]he causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable." *Id.*; *see also United States v. VanBeenen*, 872 F. Supp. 2d 1084, 1088 (D. Or. 2012) (same; secondary loan purchasers can be victims for purposes of MVRA). Looking to the causal chain and reasonableness here, all of the victims covered by the government's request became involved in the scheme during Vu's admitted involvement from January 2004 until March

---

[7] Where a page bears two different page numbers, the court cites to the page number assigned by its electronic filing system.

2006. The subsequent additional losses in equity were directly caused by Vu's co-conspirators who continued to carry out the conspiracy after he left, following the same script and using the same procedures. Most of the subsequent resales to third parties were within months of Vu's departure. The latest resales in April and October 2008, were approximately two and two-and-a-half years later respectively. This second series of equity-stripping transactions led to reasonable and foreseeable losses, the types of losses reasonably expected from the conspiracy that was the Head equity-stripping scheme. *See United States v. Newsome*, 322 F.3d 328, 338, 342 (4th Cir. 2003) (where defendant convicted of conspiracy, holding him responsible for loss caused by entire conspiracy, not just loss incurred during two month time period when he was involved, is consistent with legislative intent to fully compensate crime victims); *cf. United States v. Laney*, 189 F.3d 954, 967 (9th Cir. 1999) (restitution award may include future counseling for victim as a direct and foreseeable cause of defendant's unlawful behavior); *United States v. Rice*, 38 F.3d 1536, 1545 (9th Cir. 1994) (affirming restitution order for losses suffered as a result of bribes made a year after end of the conspiracy).

The court awards restitution for the losses in this second category of equity stripping, as identified in Column B in **Exhibit A**.

C.  Other Losses

In making requests for payments to cover other losses, the government seeks restitution on behalf of victims for the following types of expenses: legal and investigatory fees associated with fighting the loss of their homes, monthly payments sent to coconspirators with the understanding the payments were helping to ensure the victims could retain their homes, estimated (as opposed to the government's documented) losses in equity, penalties and costs associated with other loans reportedly related to the home loans affected by the scheme to defraud, lost savings and retirement funds tapped to cover expenses resulting from the loss of home equity, moving and storage expenses, in one case the net unanticipated cost of repurchasing a home, and medical expenses attributed to the stress of fighting to reclaim a home. Except where noted, these requests generally are supported by victim impact statements filed with the court as attachments to sealed PSRs or filed independently by the victim and sealed. *See*

*generally, e.g.,* ECFs 894, 918-4, 933, 958-1 through 958-7, 965-5 through 965-11, 1021-1 at 53, 59.

A restitution award may be based on victim impact statements or victim affidavits that contain sufficient detail. *See, e.g., United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) ("victim affidavits will generally provide sufficient, reliable evidence to support a restitution order); *United States v. Lindholm,* 24 F.3d 1078, 1086 (9th Cir. 1994) (affirming restitution based on amounts provided in victim impact statement portion of PSR). At the same time, where as here the defense points however generally to the government's burden to establish loss and causation, summary victim impact statements without itemization of costs or receipts to support specific findings will not support an award. *Waknine*, 543 F.3d at 556-57 (victim statements sufficient only if not "too summary" or "too conclusory"; reversing award where statements did not itemize and fully explain costs sought); *see also United States v. Newcomb*, No. 2:11-CR-00172 MCE, 2012 WL 3260473, at *2 (E.D. Cal. Aug. 7, 2012) (declining to award restitution where victim impact statement did not "explain how [] losses were directly attributable" to fraud). With these standards in mind the court addresses each category of other losses below.

             1. Legal and investigatory fees

The Ninth Circuit has affirmed restitution orders for attorneys' fees where the fees "were directly, not tangentially, related to" the offense conduct. For example, in *Lotze*, 192 F. App'x at 598, the court affirmed the district court's finding that civil litigation seeking to get toy cars that presented a choking hazard off the street was a reasonably foreseeable consequence of defendant's fraud in contracting to destroy the cars but instead reselling them. In *United States v. DeGeorge*, 380 F.3d 1203, 1221 (9th Cir. 2004), the court affirmed a restitution order awarding an insurance company's attorneys' fees incurred in litigating a civil action over rescission of an insurance contract, where the defendant had attempted to collect on the insurance policy after illegally sinking the insured boat and the defendant's conviction was based on his perjury and

other actions in the civil suit.[8]  Similarly, in *United States v. Cummings*, 281 F.3d 1046 (9th Cir. 2002), the court affirmed a restitution award of attorneys' fees incurred by a mother who in separate civil proceedings sought to regain custody of her children.  Her fees were "a direct and foreseeable result" of the former husband's criminal conduct of kidnapping their children, as "[t]here would have been no need to engage in civil proceedings to recover the children if [the husband] had not unlawfully taken them to Germany."  *Id.* at 1052-53.

In contrast, in *United States v. Barany,* the Circuit found the fees expended in defending a "wholly separate" civil suit were insufficiently related to the defendant's criminal offenses.  884 F.2d 1255, 1261 (9th Cir. 1989) (remanding for reconsideration, including because district court relied solely on probation officer's report on restitution owing).  The defendant in *Barany* was convicted of mail fraud based on the filing of a fraudulent insurance claim.  The insurer initially paid on defendant's claim, but then declined further payments; when defendant sued for breach of contract and bad faith, the insurer defended against the claims.  *Id.*  The Circuit observed that the question of fees was appropriately left to the court presiding over the separate trial, and to award them in the form of restitution would run counter to the American rule whereby litigants typically pay their own fees.  *Id.*  Moreover, the civil action was still pending in state court, with its outcome unresolved.  *Id.*

Here, victims S.T. and B.T., R.C. and B.C., H.P., R.W. and J.W. and W.A. have requested legal fees, and in the case of R.W. and J.W., private investigator fees as well.  ECFs 1338 at 4, 894-2 at 131-144 (S.T./B.T.); ECFs 1338 at 10, 1080-4 at 2-5 (R.C./B.C.); ECFs 1338

/////

/////

---

[8] *DeGeorge*, as well as *Cummings* and *Barany* cited below, all were decided under the Victim and Witness Protection Act (VWPA), appearing at 18 U.S.C. § 3663. The MVRA, passed in 1996, added a new requirement making restitution mandatory in certain cases, including Mr. Vu's. The VWPA requires courts to consider the economic circumstances of the defendant prior to ordering restitution, and the granting of restitution is discretionary, not mandatory.  "With these exceptions, the two statutes are identical in all important respects, and courts interpreting the MVRA may look to and rely on cases interpreting the VWPA as precedent." *United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004).

10

at 26, 894-2 at 110-111 (H.P.); ECFs 1338 at 28-29, 894-2 at 202-204 (R.W./J.W.); ECFs 1338 at 30, 894-2 at 2-8.[9]

The only document the court has located as supporting a request for fees by S.T. and B.T. is the first page of what appears to be an application for a temporary restraining order prepared for filing in the Fresno County Superior Court. ECF 1338, Ex. C at 7 (characterizing first page of application as "ex parte application for temporary restraining order and order to show cause regarding the preliminary injunction" noticed on July 12, 2005). In S.T.'s victim impact statement, which the court has located in the record of the case, she seeks fees for a real estate attorney she says "failed" her and her husband, and for a divorce attorney she hired after she says the loss of the family home led to their marital dissolution. *See* ECF 894-2 at 130-144 (including duplicate pages). While S.T. avers she spent $15,000 on the real estate attorney, who apparently filed the TRO application, and $9,000 on the divorce attorney, she provides no documentation to support these amounts or the details or outcomes of the legal actions they handled. *Id.* at 133.

Victim W.A. seeks legal fees paid to two different attorneys, totaling $75,000 "and adding." ECF 1338 at 30; *see also* ECF 894-2 at 2. W.A. does not describe the litigation for which the attorneys have been retained, whether the litigation is ongoing, or the nature of the claims.

The requests for fees the government advances on behalf of R.C. and B.C., H.P., and R.W. and J.W. are supported by no more than the requests on behalf of S.T. and W.A. *See* ECF 1338 at 10, 26, 28-29.

While the court does not doubt any victim's account generally, it is the government that has the burden of making the case for restitution to the court, a burden it has not met with respect to the requests for legal fees. *United States v. Baydovskiy*, No. CR090084, 2010 WL 2542019, at *5 (W.D. Wash. June 18, 2010) ("The government's description of its own

---

[9] To the extent the court relies on sealed documents other than the PSR that can be redacted to protect personal identifying information while disclosing the substantive details supporting the court's conclusion, it directs the government below to file redacted copies of those documents on the public docket. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (noting the longstanding strong presumption of public access to judicial records).

1  review of the record, of course, does not create a record before this Court."). Specifically, the
2  government has not shown by a preponderance of the evidence that the legal fees requested by
3  any victim were reasonably foreseeable or resulted from Mr. Vu's criminal conduct. *Waknine*,
4  543 F.3d at 558–59 ("court may only award restitution of travel expenses and investigation costs,
5  including attorneys' fees, if the government provides sufficiently detailed evidence to demonstrate
6  by a preponderance of the evidence" they were "necessarily incurred" and "reasonably
7  necessary"). The requests for these fees are denied without prejudice to the government's
8  resubmission of properly supported requests, if it is able to present them.
9                2.    Monthly payments to coconspirators; estimated loss of equity
10         Victims J.H. and E.S. seek restitution for monthly payments they made to
11 coconspirators to stay in their homes during the time they thought they were being rescued from
12 foreclosure. ECF 1338 at 14, 20; ECFs 918-4 at 153 (E.S.), 1021-1 at 54-56 (J.H.). R.W. and
13 J.W. seek a lump sum amount they say they paid to coconspirator Charles Head to remain in their
14 home. *Id*. at 28-29; ECF 894-2 at 202-204. Victim R.L. seeks a lump sum in the amount she
15 says coconspirators "kept in escrow"; the government represents her property was one that
16 coconspirators "were tracking" in the records of homes they controlled. ECF 1338 at 29-30; ECF
17 894-2 at 90. Victim W.A. seeks amounts for "lost equity" and "equity second," with the specific
18 amounts sought included in his sworn victim impact statement. ECF 1338 at 30; ECF 894-2 at 2-
19 8. Victim A.L. seeks $87,211.27 in lost equity evinced by a document on which is recorded by
20 hand a wire transfer for this amount related to the equity-stripping transaction affecting A.L.'s
21 home. ECF 1338 at 28 & Ex. SS-3. Victim L.A. seeks $246,319.71 in lost equity, supported by a
22 bank statement showing the wiring of that amount to an account managed by a coconspirator. *Id*.
23 at 29 & Ex. UU-3. Victim T.R., in her victim impact statement, states her loss of equity as
24 $93,000. /////
25 /////
26 /////
27
28

12

ECF 918-4 at 143-144.[10] The government's brief and supporting document, ECF No. 1338, Ex. EE, show T.R. incurred a net loss of equity of $73,492.08.[11]

These victims' claimed losses of equity and lump sum or monthly payments to Mr. Vu's coconspirators are consistent with his admitted offense conduct. *See* Plea Agreement at 17-19, ECF No. 269 (conspiracy involved requiring victims to make monthly "rent" payments they were told would improve their credit, but had the effect of "stripping equity" from their homes). With its restitution memorandum, the government has provided financial documents showing payments and wire transactions related to property in the names of the victims identified above. The court finds these losses supported by a preponderance of the evidence, and a foreseeable result of Mr. Vu's conduct. *Cf. United States v. Meksian,* 170 F.3d 1260, 1263 (9th Cir. 1999) ("A restitution order is authorized if the defendant created the circumstances under which the harm or loss occurred.") (quoting *United States v. Spinney*, 795 F.2d 1410, 1417 (9th Cir. 1986)).

Another set of victims seeks restitution for lost equity, but without the support required to support a restitution award. One victim, W.D., makes a request for a lump sum of $130,000, which he says includes lost equity as well as other losses. He provides no breakdown or detail to allow an award of restitution at this time. *See* ECF 894-2 at 18. B.L. and T.L seek $47,000, the difference between the price they say coconspirators told them they would pay to repurchase their home and what they actually paid on repurchase. *Id.* at 26.[12] C.J. and M.J. request $225,000, a lump sum for lost equity and moving expenses. ECF 1338 at 27. They also do not provide any breakdown or detail to support this request. ECF 894-2 at 79-80. G.W. and R.W. seek restitution for an estimated amount of lost equity, which the government merely says is

---

[10] The government's request, ECF No. 1338 at 20, states T.R.'s victim impact statement losses as $73,492.08 in equity and "additional losses due to moving expenses," less $10,000 reimbursed by a third party. However, her victim impact statement does not mention any moving expenses. ECF No. 918-4 at 143-44.

[11] The government's brief provides the incorrect total of $83,000 in the heading of its discussion of T.R.'s request. ECF 1338 at 20.

[12] Without a pinpoint cite, the court has not located a victim impact statement for B.L. and T.L.

"consistent" with the amount of equity lost by other victims in their shoes. ECF 1338 at 27-28.[13] The court does not grant these requests at this time.

### 3. Miscellaneous Requests

Certain victims have made restitution requests to cover a range of other kinds of costs or losses. These include: loss of a boat, car and 401(k) funds by R.C. and B.C., ECF 1338 at 10, ECF 894-2 at 15, ECF No. 1080-4 at 3; loss of a car as a result of a higher mortgage cost by E.S., ECF 1338 at 20, ECF No. 918-4 at 153-154; prepayment penalties, interest and fees associated with previous loans, and lost savings by W.D., ECF 1338 at 25, ECF 894-2 at 18; appraiser's fees, moving expenses, storage rental, security deposits and rent by H.P., ECF No. 1338 at 26, ECF 894-2 at 110-111; moving expenses and lost annual leave and retirement funds by C.J. and M.J., ECF 1338 at 27, ECF 894-2 at 79; medical expenses by R.W. and J.W., ECF 1338 at 28-29, ECF 894-2 at 202-204; and home repairs by W.A., ECF 1338 at 30, ECF 894-2 at 4.

Here again, while the court does not doubt these victims' accounts generally of the ripple effects of the criminal conspiracy in which Mr. Vu was involved, the government has not shown by a preponderance of the evidence that these other costs were foreseeable and sufficiently closely related to Mr. Vu's central offense conduct to support an award of restitution under the applicable law. At most, the amounts sought are supported only by summary victim impact statements without supporting documentation. *Cf. Waknine*, 543 F.3d at 557 (district court erred "by relying exclusively on the one-page loss summaries provided by the victims and in not requiring more detailed explanations of the losses each victim suffered"). These requests also are denied without prejudice to resubmission if a better record can be provided.

### III. CONCLUSION

For the reasons set forth above, the court awards restitution in the total amount of $6,242,641.51, with identified victims paid the individual amounts shown in Column F of the attached **Exhibit A**.

---

[13] Without a pinpoint cite, the court has not located a victim impact statement for G.W. and R.W.

The government is directed to file, within fourteen days, copies of the pages of the following sealed documents relied on by the court, redacting all personal identifying information: ECFs 894-1, 894-2, 918-4, 1021-1, 1080-4.

The Clerk of the Court is directed to issue an amended judgment reflecting this order, with Mr. Vu paying restitution jointly and severally with other codefendants convicted in this case.

DATED: August 3, 2015.

_____
UNITED STATES DISTRICT JUDGE